**PELICAN PRODUCTION CORPORATION,**
Appellant,

v.

**Ron MIZE, acting Director, Building Inspection Department of the City of Oklahoma City, Appellee.**

**No. 47589.**

Supreme Court of Oklahoma.

Nov. 29, 1977.

Rehearing Denied Feb. 1, 1978.

Richard A. Riggs, John E. Sargent, Jr., McAfee, Taft, Mark, Bond, Rucks & Woodruff, Oklahoma City, for appellant.

Walter M. Powell, Municipal Counselor, John M. Williams, Asst. Municipal Counselor, Oklahoma City, for appellee.

WILLIAMS, Justice.

Pelican Production Corporation, appellant, hereinafter called Pelican, filed an application with appellee, Ron Mize, the acting director of the Building Inspection Department of the City of Oklahoma City, for a permit to reopen an existing gas well on a designated site in an 80-acre tract of land in northwest Oklahoma City, which well has been there some fifteen to seventeen years. The tract is zoned "A" single family residential, a zoning classification which does not permit such use. Appellee denied the application and Pelican appealed to the Board of Adjustment of Oklahoma City, seeking a variance from the terms of the zoning ordinance pursuant to 11 O.S.1971, Sec. 407. The Board denied the variance and Pelican appealed to the District Court where, after trial de novo, judgment was entered affirming the order of the Board denying the variance. Pelican then appealed to this Court.

The case was assigned to the Court of Appeals, Division No. 2, which promulgated an opinion reversing the trial court judgment on the sole ground that the Oklahoma City ordinance involved is unconstitutional. Thereafter, on application of appellee, this Court granted certiorari.

■ The record before us shows that no copy of the ordinance concerned was admitted in evidence or set out in the pleadings. It is well settled that courts will not take judicial notice of municipal ordinances; *Drake v. Tims*, Okl., 287 P.2d 215; *Lakewood Development Co. v. Oklahoma City*, Okl.App., 534 P.2d 23. The record also shows that the constitutional question was not presented in the trial de novo in the District Court, but is argued for the first time in the briefs on appeal to this Court. See *Midwest City v. Eckroat*, Okl., 387 P.2d 123. For these reasons, we will not consider the constitutional question.

In the briefs in this Court, Pelican argues generally that it met the burden of proof required of applicants for variances from the requirements of a zoning ordinance, and that the judgment of the district court to the contrary is clearly against the weight of the evidence.

■ It is well settled that the applicant for such a variance has the burden of showing (1) that the granting of the variance will not be contrary to the public interest; (2) that the literal enforcement of the ordinance will result in unnecessary hardship; (3) that by granting the variance the spirit of the ordinance will be observed; and (4) that by granting the variance, substantial justice will be done. *Twist v. Kay*, Okl., 434 P.2d 180; *Application of Shadid*, 205 Okl. 462, 238 P.2d 794.

■ With those rules in mind we now examine the evidence in the record before us. It consists of the testimony of seven witnesses, most of whom qualified as experts in their particular fields, and documentary exhibits.

Pelican presented the testimony of Mr. H, a graduate Petroleum Engineer and Registered Professional Engineer with about 25 years of experience in the business of locating oil and gas drilling prospects. He gave substantially uncontradicted testimony as to his reasons for concluding that gas could be profitably produced at the well site concerned. He also gave testimony that in the preparation of the well site, a "work-over rig" would be used for five or six days, after which a "pulling unit" would be in operation for about three weeks. After that, the equipment on the surface at the well site would consist only of a wellhead "about the size of an over-stuffed living room chair", a separator, which is a tank about three feet in diameter and ten or twelve feet tall, and two small conventional oil field tanks, all of which could be installed in an area of about fifty square feet.

Insofar as service and maintenance are concerned, he said that after the well was in operation, a "meter man" would visit the well about once every eight days to "change the chart on the meter" and that, on the basis of past experience with wells in the same general area, maintenance work would be required about once every three of four years. He said that two different companies had existing gas pipe lines in the area, one of which ran diagonally across the 80 acre tract. He gave his professional opinion that there was less than a "one percent chance" that oil might be found in the well in paying quantities. (Discovery of oil would require a larger installation, more equipment and more maintenance and, would cause more traffic.)

Pelican also presented the testimony of Mr. F, a graduate Petroleum Engineer with 34 years of experience as a petroleum consultant, 15 of which were in the Oklahoma City area. His testimony was generally in accord with that of Mr. H. He also said that in his opinion the well would produce about a million MCF of gas, with a life of no more than ten years. He also said that in his opinion no compression of the gas would be necessary, but that if it were, the compression equipment would be installed by the purchaser somewhere on the pipe line, and not at the well site. He said a safety device would be installed at the well site which would automatically shut off the well in case of a sudden change in pressure accidentally caused. He said that because of existing pressure in the well no pump would be required and virtually no noise would be caused by the operation of the well.

Mr. C, called as a witness by Pelican testified that he is an employee of the Oklahoma City Planning Department and a staff advisor to the Board of Adjustment, in which capacity he prepared a staff report recommending that Pelican's application for a variance be denied. From the report, which was admitted in evidence, and his own testimony, it is fair to say that his principal objections were to the noise and "traffic generation" that would be produced by an operating *oil* well in the area. He

testified that he had no background in Petroleum Geology or Petroleum Engineering and that his objections as to noise were based on the ". . . drilling, and then the equipment coming and going, maintenance crews and so on, *especially* if it was an oil well" (emphasis added).

The last witness for Pelican was Mr. R, a consulting planner with a graduate degree in Regional and City Planning from the University of Oklahoma. He had done comprehensive planning work for several Oklahoma municipalities, and for three years had been Chief of the Oklahoma City Planning Division. He was familiar with the area in question; he said it was undeveloped and that its most significant physical feature was a creek, with a heavy tree line, running across it from the southwest to the northeast. In answer to a comprehensive hypothetical question, he testified that in his opinion the granting of the variance would not be detrimental to the property or to the public interest, or contrary to the spirit of the ordinance, and that it would not adversely affect residential development in the area.

Pelican then rested and appellee demurred to the evidence. After the demurrer was overruled, appellee presented the testimony of four witnesses.

The first one was Mr. C, who had previously testified for Pelican. He expanded upon his reasons for recommending denial of the variance. His chief objection was the "maintenance crews going and coming and maintaining this thing" which would not be compatible with residential development. He said there was great "development pressure" in the area because of the proposed North outer loop to be built along a main east-west road immediately south of the 80 acre tract.

The next witness for appellee was Mr. G, a planner for a private engineering firm which had been employed by the owner of a surface tract which included the 80 acre tract in question. He testified that the area was "real ripe for development" and that the proposed reopening of the gas well

would present "design problems" and affect the "saleability" of the lots.

Appellee then called Mr. B, the treasurer of a real estate firm which own several hundred acres of land in adjoining sections, and some land in the same section as the proposed well site. He testified that in his view the "highest and best use" of the area would be for residential development, and that the presence of a producing gas well would inhibit residential development "to some degree".

The last witness for appellee was the executive vice president of a real estate development firm owning 160 acres of land in a quarter section adjoining the 80 acre tract on the east. He testified that the reopening of the gas well would tend to "devalue" the area and make it less desirable for residential purposes. However, he also testified on cross examination that three producing gas wells immediately across the road south of the property had not "devalued" it.

Among the documentary exhibits included in the record is a large scale (1 inch to 400 feet) aerial photograph of the section of land which includes the well site. There is no suggestion that it does not truly represent the area, and at least to that extent it may be said to constitute uncontradicted evidence. It shows that there are no improvements at all on the 80 acre tract. The nearest building is what appears to be an old farm house about 600 feet to the southeast. The nearest developed residential area is about half a mile to the northeast. An existing dirt road leads from the main road on the south edge of the subject eighty-acre tract to a point about 50 feet from the well site. The well site itself is in, or at the edge of, the heavy tree line which follows the creek running through the area.

In *Board of Adjustment of Oklahoma City v. Shanbour*, 435 P.2d 569, 574, Okl., 1967, we were considering a case wherein the trial court was affirmed as to an order granting a variance to permit construction of a drive-in movie theatre on a tract of land adjoining Western Avenue in south Oklahoma City. We observed in the opinion that in an earlier opinion in *Van Meter v. Wilcox Oil and Gas Co.*, 170 Okl. 604, 41 P.2d 904, 910, we had noted that financial gain or loss (to owners of neighboring property) has no bearing on whether an unnecessary hardship has been established. Therein we delineated the facts to show that applicant's property was unlike and different from the adjoining property. The same is true here.

From a careful review of the entire record before us, we think the clear weight of the evidence justifies several conclusions. No other property in the area here involved has a gas well located thereon. Only a minimum amount of surface equipment would be installed in a fifty foot square area. It could easily be shielded from view in the tree line, or be placed away from the well area down south by the road and shielded from view by a chain link fence and appropriate shrubbery. The only traffic generated on a regular basis would be a visit about once a week by the "meter man". Very little noise would be caused by the operation of the well. We therefore can only conclude that the granting of the variance would not be contrary to the public interest, the spirit of the ordinance would be observed, and substantial justice would be done.

Because the existing roads and gas pipe lines are already located in the immediate area, very little construction work away from the well site itself would be required. In view of the admission of appellee's own expert witness that existing gas wells across the road immediately south of the 80 acre tract have not "devalued" nearby lots, it may be doubted that residential development would be hindered. In view of these conclusions and the uncontradicted evidence as to the amount of gas to be recovered, it is clear that a literal enforcement of the ordinance would work an unnecessary hardship on Pelican. Although it is conceded that a producing *oil* well at the site would be more objectionable, under uncontradicted evidence that eventuality is very remote.

We therefore hold that the judgment of the trial court refusing to grant the vari-

ance is clearly against the weight of the evidence.

The decision of the Court of Appeals is vacated; the judgment of the trial court is reversed, and the cause is remanded to the trial court with directions to grant the variance.

LAVENDER, V. C. J., and DAVISON, IRWIN, BERRY, BARNES and SIMMS, JJ., concur.

HODGES, C. J., and DOOLIN, J., concur in result.